Court of Appeals for the Federal Circuit is now open and in session. God save the United States and the Honorable Court. Good morning. We are ready for oral arguments in today's case. We have only one case scheduled for oral arguments today. I happen to hear a lot of feedback at the moment. Perhaps people can unmute their devices when they're not using them. I now call the first case. This is Transpacific Steel v. United States 20-2157. Counselor Hogan, are you ready to argue? I am, Your Honor. Okay. And remind me how much time you reserve for rebuttal. I have asked for four minutes, Your Honor. Okay. All right. You may begin. Thank you. Good morning and may it please the Court. The President acted constitutionally and lawfully by modifying the import restriction on steel articles from Turkey. In setting aside Proclamation 9772 as unlawful, the Court of International Trade committed two critical errors, both of which require reversal. First, the trial court ignored settled congressional meaning that action to adjust imports is a continuing authority and includes modifying previously taken action. We know this from the legislative history going back as early as 1955. And prior presidents exercised their 232 authority of a continuing authority. Counselor, is it your argument that the President has no limits that are imposed by any provisions in 232? Absolutely not, Your Honor. There are limits that are set forth in the statute. I think most notably, the President cannot act first without an investigation by the Secretary. And of course, the President cannot take any action to adjust imports if he does not concur in the findings of the Secretary. What about the time limits? What about the time limits that are in the statute? Go ahead. Yes, the timeframes are for concurrence and implementation. And I should note that in this case, the President did act within those timeframes to concur with the Secretary's finding and to declare or proclaim the course of action that the President is going to take. But that's a separate question from the question of whether once the President has taken timely action, as he did here, the authority that has been delegated by Congress includes the authority to make adjustments to ensure that the national security objectives of the statute can be met. And in this situation, the addition of those timeframes in 1988, Congress was not acting against a blank slate. It was carrying forward that same understanding, that same meaning, that action to adjust imports is a continuing authority. And while... Mr. Hogan, this is just Toronto. Can I ask you, am I right that in the briefing in this case, there was no citation of the 1975 opinion of Attorney General Saxbe, which has recently been relied on in one of the opinions in the CIP, in the prime source case, which seems to say things that have some bearing on this question of whether such action means a continuing course of action. Can you just address that opinion? Is it relevant? If it's relevant, why haven't we seen it and so on? Yes, Your Honor. I mean, I think it is relevant in that we believe that it a lot of the legislative history and, again, the actual presidential principles that we have relied upon in our briefs so that we can try to cite... Yes. This is Judge Chen. I'm not familiar with this 1975 opinion. What is... Do you know the name of the trade court opinion that refers to this 1975 opinion? Yes, Your Honor. This is a recent decision by the Court of International Trade called Prime Source Building Products. And in that case, the dissenting opinion, the dissenting judge in that case relied upon that, cited that opinion. And we did not cite it in our brief. We would certainly be happy to provide it to the court if that would be of use. I think that our, again, I think our position or interpretation of the statute is based on... It follows much the same in that opinion in that we're relying upon the principles of congressional acquiescence, principles of settled legislative meaning. So I apologize to the court that we did not cite that specifically, but we thought that the sort of the original principles might be more directly relevant to this court's inquiry. Counselor, this is Judge Reyna. It seems to me that you were arguing just before you started issuing additional questions that the president can modify his actions without getting a new report or getting additional data from the ITC. Is that correct? Yes. We are saying that the president does not need a new... To begin a new investigation by the Secretary of Commerce before he can adjust action that has been previously taken as he did in Proclamation 976. Well, if we look at the framework, the statutory framework that we're dealing with here that does contain some temporal limitations, it seems to me that that framework is based on ensuring that the president is taking action on recent data, a recent report. And if the president could take action without a new report or an updated report, then how do we know or how can we be sure that he's acting on updated information? Well, first, I would say that the formal investigation by the Secretary is not the can receive advice and information from his advisors. And particularly in this case, in Proclamation 9772, the president did say that he had received information from the secretary. And so nothing in the statute precludes the president from getting those updates that we might expect the president to have. But the question about whether the president... I assume those updates or the ability to obtain an update is based on Congress's view that the president should be acting on recent information or updated information. I think it's safe to assume that Congress wants the president to act on the best information that the president has. And I think that's in part the reason for the delegation, that it's the president and his advisors who are going to have the quickest, most up-to-date access to information relevant to national security. And that's why there's deadlines within the statute, correct? Well, I would say that the deadlines are not so much to ensure that the president is acting on fresh information, but to ensure that once a threat of impairment to the national security has been identified, that there's prompt action. So there's a deadline for the secretary to complete that investigation, and then there are deadlines, time limits for the president to determine whether he concurs and to implement that action. But there's nothing in the statute specifically that... When you say prompt action, how do we know action is prompt? Well, we know that the prompt action that Congress was most concerned about was the president's concurrence and the president starting to do something. And we can look at the historical evidence of the machine tools case and that the perception that Congress had that the president Reagan was sitting on a report, not making a decision, not making a decision, not taking any action. It's very clear in the trial court did not dispute that what Congress was most concerned about in 1988 was delay in taking some action, but Congress did not... That delay, the guard against delay is brought about because there's a need to ensure that this type of action, this unilateral raising of tariffs is done on an informed basis, wouldn't you say? I guess I don't think we dispute that Congress intended that the president act on the best information that he has. And that's in part why the delegation has been given to the president rather than reserved. How do we know whether the president is acting on best information if after making the original concurrence, then we impose or there's no imposition on the president as to seeking additional information or seeking an updated report if additional action wants to be taken? Respectfully, that's not the court's role. It would be Congress's role. It seems to me that your argument defeats in part the purpose of the statute and that's for the president to act on updated information. Well, again, I think we would disagree that the statute talks about updated information or that that was even driving the amendments in 1988. I think we certainly don't... Ms. Hogan, Ms. Hogan, Ms. Hogan, this is Jeff Hrodek. Just on that specific thing, is there material, forgive me if I just don't remember it, from the, let's just call it legislative history broadly considered, that indicates that at least one, maybe even the information or was it, I guess, the things that I guess I'm remembering from your point of view is that the concern was that without a deadline, the president could simply not take any action at all and that was problematic. But are there materials that have been cited to us or that you're aware of in which portions of Congress committee members, members of Congress, whatever, say we're concerned about the staleness of information if the president waits too long after getting the secretary's report? I certainly, I don't recall that, Your Honor. What I would say is that the concerns about staleness are addressed by the fact that the president must concur within 90 days and implement... What would be the practical negative consequence of enforcing the deadline by requiring a new secretary report following the procedures of consultation for the president to importation after the times have run? Why is it not, oh, well, we may as well just insist on the report because it's not a big deal and that follows the statute better? Well, we disagree that it's what is required, but... I understand that. In terms of the practical consequence, Your Honor, it's a consequence to national security. It's not at a mere administrative inconvenience. And it is, in some sense, repeating the same work twice before... Unless the world has changed. Unless the world has changed. And I would say that the president always has the right to ask the secretary for a new report. We see that President Nixon did that after 20 years of original proclamation on petroleum products, but it's not what is required from the statute. And it would hinder the president's ability to be able to act quickly to address changing circumstances. Can I ask a changed topic and ask this question? Is 9772 justified under, what's it called, C3A, little 2I, big 2I? Namely, that's the provision that says if the president actually negotiates an agreement with a particular country and, among other things, or among other possibilities, finds that it is ineffective in averting the threat, the president shall take other action. Could 9772 be characterized as when the president says in the proclamation, we still have too many imports? Capacity utilization of domestic or utilization of domestic capacity is still too low for a country. And that is after the South Korea and Brazil agreements from a few months before. Is that a determination in substance that the agreements that have been reached with South Korea and Brazil are ineffective in averting the threat or ineffective in eliminating the threat, I think is the statutory language. And therefore, this particular action is covered by the language of that provision. I'm not sure you've made that argument, but I'd like to hear your thoughts about it. Yes, you're correct that we did not make that argument because we think that the President did not make that argument. You may continue. Thank you. I would say that we have not read the statute to that the C-3 would be authority for what the president did here. But perhaps I can give it a little bit more thought. But I would say that that's not the interpretation that we are relying upon here. When the president modifies the original remedy and increases terrorists dramatically, let's say, is it because the president and his discretion has determined that the national security interests has increased as well, that risk to national security has increased as well? It's possible that that could be a reason. I mean, for example, when President Reagan imposed essentially embargoed petroleum from Libya in 1982, there was a specific finding that trade with Libya would be inimical to our national security beyond the threat of impairment generally globally with respect to petroleum products. In this particular case... That's a good example. Suppose that the president raises the terrorists and doesn't reveal why he has raised the terrorists. But he did it because not because of an increase in the risk to national security, but because of trade dislocations that have been caused by the increase in the terrorists, say, moving to labor, or even the sale of oil. Now the sale of oil has caused... It's now the basis. Dislocation of sales of oil is now the basis for the president's determination to raise the terrorists additionally, not national security. Can the president do that? The action to adjust the imports, what action the president takes is entirely within his discretion. Once you've made that concurrence that there is a threat of impairment to national security, so long as the president continues to believe that there's a threat of impairment to the national security, then the statute delegates a great amount of discretion to the president to determine how to... Okay. So whatever decision the president makes, it's got to be based on some form of impairment to national security. Yes. I would say both procedurally, that there has to be a concurrence, so there has to be an affirmative finding by the president. And second, that subsection E... If that's the case, then can we assume that terrorists are increased, that they're increased because there's also a commensurate increase in the risk to national security that must be answered? No, I don't think it's necessary for that assumption. I think that what the president did here is to say that the measures that I've selected to address that threat of impairment are ineffective. And so I need to make changes so that there will no longer be a threat of impairment to national security. In other words, so that I can achieve the statutory objective. I would say that the difference is the sort of finding that there's a threat of impairment to the national security, which remains in place until the president determines otherwise. And then there's a remedy that in the president's judgment is necessary to combat that threat. And that remedy may change. Ms. Hogan, this is Judge Chen. I'm interested in trying to understand better your conception of the president's authority under this statute and trying to figure out how far does that authority go. It sounds like you're contending that once the Commerce Secretary in consultation with the Defense Secretary does an investigation and issues a report that there is a threat to national security and articulates a specific rationale for what that threat to national security is. And here it was the domestic steel plants being underutilized and not being utilized at a high enough level for U.S. defense needs. And then the president acts and agrees under national security, the president needs to take action. And your position here is that the president has the right under the statute to take continued action. Is that continued action, does it need to be tethered to not only national security, but the actual rationale that was articulated in the Commerce Secretary's report? Or in your view, is it that once the president agrees that there's a national discretion in the name of national security to do whatever he wants whenever he wants and just invoke the concept of national security and say, well, now I'm moving the rates up, now I'm moving them down, now I'm switching over to quotas here, there, everywhere, all under the broad umbrella of national security? I'm not sure if my question is clear, but do you understand where I'm trying to go? I'm trying to figure out to what extent is the president's authority have some constraints and guardrails put in place given the preconditions articulated in the secretary's report on why there's a national security problem? So the president's discretion, while very broad, it is not untethered. It is tethered to the action that the statute charges the president with taking, which is adjusting imports. So the president is always limited to the articles or their derivatives that were the subjects of the secretary's investigation, and the president has to act to adjust those imports. So he can't take any action. There has to be some connection to the articles that were the subject of the investigation or their derivatives. I guess here's my question. Here's a hypothetical. Here it appears that the president took a second action because he concluded that the expected increase in domestic steel production under the first action didn't really happen. And so we as a country were not yet at that 80% utilization rate. So he said, okay, well, then we need to reduce imports further, and we're going to do that by increasing the tariffs on the imports coming in from Turkey. All right. But what if, and your theory is there's a connection there between that second proclamation and the secretary's report. But what if the president instead had said, well, I've decided now in August of 2018 that I want domestic steel utilization to be up to 100% because I think as president, that's what best secures national security. So under that altered different rationale than the one that was given to me by the commerce secretary, I'm going to yank up tariffs on Turkey and maybe some other countries. In your view, would that be possible under the statute or, for example, would that be a non-delegation doctrine problem? I would say that the president is not bound by the factual findings of the secretary. It's whether in terms of, you know, what's the best capacity utilization that would no longer threaten to security might be. So I wouldn't want to suggest that there might be changing facts and circumstances that might alter how the president, I think that still gets to the question of the remedy that the president is selecting to address the national security impairment. And impairment is still caused by the quantity and circumstances of imports. So that effect is on the weakening of our internal economy. So I wouldn't want to say that that would necessarily be precluded under the statute because I think that the rationale would still be the same. Well, what I'm trying to do in my hypothetical is create a different rationale. I mean, they're both invoking the notion of national security. I understand that. But it's a different rationale, a different understanding of what it would take in terms of protecting national security. And now the president is electing to act on a different rationale than the one that was articulated and earlier agreed upon with the Secretary of Commerce. Right. So I guess I would say that the secretary's role is to investigate whether there is a threat of impairment to national security, and the president has to concur or not concur. And there's no specific instructions in the statute about how descriptive the president must be in what he's concurring to other than the ultimate finding. So then as I understand your position then, as soon as there's a concurrence, a meeting of the minds between the president and the Secretary of Commerce, an open playing field, any date after that to, you know, and successive presidents can, in the name of national security, again, for a basis that's perhaps different than, very different than qualitatively than what was the initial basis for finding a national security threat, take many other actions in the future just because of this initial secretary report that was originally based on a different rationale for national security. Is that how I'm, is that what your position is? Well, I wouldn't say exactly like that. Okay, you wouldn't say it like that, but I mean, is the effect the same? Yeah, I think the effect is the same. Once the president has concurred with the finding, with the ultimate finding that there's a threat of impairment to national security caused by either the quantity or circumstances... Then from that point forward, he has a tool that he can use whenever he wants to use for whatever reason, when I say reason, I mean specific rationale, as long as he can say that it's connected to national security. So long as the reason is to, is tied to the statutory objective and it's an action to adjust imports, which is the limiting principle of the statute. And yes, and I think that that's... Right, but the statutory objective to you is just national security. Well, I would say the statutory objective is to avert the threat of impairment to national security caused by imports of articles. So it's a little bit more specific. How do you know that the national security threat is caused by a rise in imports or by certain imports? When the president concurs with the report of the secretary, the president isn't just saying, yes, I agree. The president is saying, yes, I agree to the data and the indicators included in the report that provide the basis for me to say that I need to increase tariffs. And it also provides me, the president, the basis by the levels at which to increase tariffs. If that's the case and the president concurs with that report in that manner with the data in the report, then how is it that the president can later just increase at its own discretion and at its own will, make a dramatic increase in tariffs without any type of basis or anchor to the trade data in the matter? I would go back to the statute, which does not require the president to concur or agree with any of the data or any of the recommendations for action that the secretary puts forward in the report. What subsection C1A1 requires the president to do is to determine whether he concurs with the finding of the secretary. And that finding is a finding that the article is imported into the United States in such quantities or under such circumstances as to threaten to impair national security. So we would not say that the president is required to accept the data that the secretary provides or the recommendation. The finding is based on the data. In trade law, data is the evidence that you're dealing with. It provides the basis by which agencies make informed decisions. And that's the purpose of a 232 report, isn't it, to marshal together the evidence, the data, the trade data that exists, and then to evaluate that trade data, and then to make a recommendation to the president. If the president accepts that recommendation, then the president's accepting the basis of that recommendation. Is that true? I think respectfully that no, it would not be the case that the president is required to accept or be limited by the data that is in the secretary's report of investigation. It certainly informs the president. Then there's no purpose for the 232 exercise. We respectfully disagree, Your Honor. The secretary's investigation is that consultative role to gather that data, to make analysis, to make reasonings, to consult with the secretary of defense, to involve the public if it's appropriate, and to provide the president with that information. That certainly informs the president, but the president is not limited by it in any way. That's correct. The president's not limited. The president can make a left turn instead of turning right. If the secretary says, turn right, the president says, I agree with everything you say, but I'm going to turn left. But later on, five years down the road, can the president say, I'm going to make a U-turn now? Can the president say, I'm going to go further or stop? Well, in terms of the remedy that the president is selecting, yes, Congress intended that the president have continuing authority to modify, to terminate, to reduce, or to continue to address... Didn't Congress eliminate the modification that you're talking about in the 1988 amendment? No, we respectfully disagree that it did anything other than... The statute at that time said the president shall take such action, and for such time as he deems necessarily. That was changed. That was changed. Yeah. So now the president cannot take a left turn five years down the road, correct? The statute was changed precisely to eliminate the type of discretion you're saying that the president has to take such action and for such time as he deems necessarily. That's what you're arguing, but that's not what the law says anymore. That was changed. Congress changed that. Congress did change it. And if the court... I know that I'm well over my time, but if the court will permit me to walk through that language. Your honor is absolutely correct. Prior to 1988, the statute permitted the president to take such action and for such time. In the 1988 amendments, what the president is required to do is to determine the nature and the duration of the action that he deems necessary. We believe that that nature and duration language is change in terminology without a difference. That for such time and such action and for such time is now the equivalent now is the president's determination to identify the nature and the duration of the action. You've expressed a new rule of statutory interpretation, a change in terminology that makes no difference. I certainly would not be able to apply that in my line of business. Just so I understand nature and duration of the action. If the original proclamation 9705 hadn't said anything about ordering the Commerce Secretary to continue monitoring steel imports and in case the president wants to make future adjustments. Let's say that was deleted from this proclamation. Is it your view that despite that silence in the original proclamation, the president still had the authority to continue to make future adjustments if and when he was apprised of in his view the need for further adjustments? Yes. I think particularly with respect to that nature and duration language. The nature of the measure that the president selected here was a strategy. One that primarily was tariffs, which is the action that we're talking about here, but also included negotiations with other countries and the monitoring that the court has omitted in the court hypothetical. What has not changed in the statute is the direction to the president to take action to adjust imports. I'm trying to understand where would the duration component come into play? Because if your position is duration encompasses an indefinite time period, an unspoken indefinite time period. Is that fair to say? Yes, your honor. The duration that the president proclaimed in 9705 was essentially that the import restrictions would remain in place until the president determines that they're no longer necessary. I don't think there's any evidence that the Congress intended that the president, for example, say these tariffs will only be in place for one year. Because we don't think that that runs one contrary to sort of the predictive judgments that Congress has delegated to the president. Then just as a practical matter, in terms of national security, it doesn't make any sense to proclaim that ahead of time to foreign countries. I guess again, in your view, although this proclamation was issued in 2018, a president in 2045 could refer back to this proclamation and say, well, I want to do the following increases and decreases to imports from the following countries by applying this new set of tariffs to those countries products. Under national security, would that be okay? The best evidence that we have that that is okay is the congressional acquiescence to the operation of the petroleum import program over decades, where Congress, even though it may acquiesce to presidents exercising that authority from a proclamation from 1959 all the way to 1980. Congress can always pull back that authority. I think another point to make here is that, one, Congress knows how to put time limits on the president. We can see that in examples like Section 201 of the Trade Act, which limits the president. Ms. Hogan, I understand your view is that this is a very broad authority. I understand your rationale for why that is so. Can I take you back to Algonquin and the non-delegation doctrine and the concern there? Well, who knows what the state of play is with Algonquin today, but assuming that it is right, nevertheless, Algonquin's rationale was really about some kind of intelligible principle to which the president is directed to conform. In Algonquin, the court said, well, it was that initial secretary report investigation and findings that was an important critical precondition to any presidential action. So, I guess my concern with your position is that it seems to be the government's position that the president, under this authority, under this statute, can take lots of different actions in the name of national security that doesn't necessarily conform to the articulated reasons the secretary had initially made an investigation and findings on in the name of national security. So, can you explain why everything would still be constitutionally acceptable in view of the non-delegation doctrine? Well, the Algonquin court found that there were no non-delegation concerns whatsoever with Section 232 and the earlier iteration of Section 232, which... I understand that. I'm talking about a hypothetical that you are embracing, which is the idea that the president really has this power, this very broad power to engage in all kinds of subsequent actions, an entire litany of actions that go far into the future that are really, although in the name of national security, completely untethered to the specific rationale that the secretary had made for its basis why there was a national security threat. And then why isn't that a non-delegation problem in that situation? I mean, the non-delegation... Well, let me first answer specifically with respect to Algonquin, because in Algonquin, the Supreme Court was actually reviewing action that was taken, again, some 20 years after the original proclamation on petroleum products. And in that, the Supreme Court described what President Nixon had done as radically amending the program by moving away from a quota program into an import licensing scheme. So sort of the qualitative differences between the remedy that the president was imposing some 20 years afterwards. The court was aware of the president's usage and exercise the power under Section 232. And that... And this is just a factual matter. Did President Nixon's secretary of treasury, I guess, the person at the time, make a new report at that time? Or was this all based on the Eisenhower era report? No, at that time, the secretary, there was no new investigation. Until 1975. So it was still two years after President Nixon started winding down the quota program. And this is before the 1988 amendments, correct? I mean, we were looking at a different statute at that time. Yes. Although if anything, I think what the court is concerned about is whether there's any non-delegation concerns, which, you know, this court already in a... Recently in a non-presidential opinion concluded that this court was still bound to follow Algonquin. But... So I'd like to follow up a little bit on the discussion with Judge Chen. And this goes back to the nature and duration provision of the statute. And we can see in there that... And there's got to be some sort of tie between any action taken by the president and a sense of impairment to the national security. What if the president determines later on to take action that's not tied to a sense of impairment on national security? What if it's outside of the realm of national security? Does the president have discretion under the statute to do that? Is it... No. I mean, the president has to follow the statute. The statute outlines non-exhaustive factors in subsection two of what the president is to consider in addressing national security. And if the Congress believes that the president is not acting consistent with our national security, it always has the power to rein in the president. But the suggestion that the court can... Wouldn't the court also have the authority to determine that a president has acted outside its statutory authority? Yes, to the extent that it does not require this court to review the factual findings or the exercise of the president's judgment. Correct. Okay. Can I just... Do my colleagues... Yeah. Yeah, I do. I do. So we just spent a lot of time talking about what I guess I would expect the executive branch to say, which is, no, we don't see very many limits on the authority. But I'm trying to figure out how much of that is essentially hypothetical and how much of it is presented here. Isn't it... Is it the case that in this situation, we have two things, namely the 9705, the original pronouncement or proclamation, expressly says that we're going to keep an eye on what's going on in the future, including with respect to agreements. We're going to negotiate and depending on what we negotiate in agreements, we may actually need a corresponding adjustment to the tariff as it applies to other countries. And second, when 9772 comes along in August of 2018, it doesn't vary depart from... It doesn't depart from the rationale of the secretary's report. It says, the problem is that the 80% utilization ratio that we're looking for hasn't been achieved yet, so we need to do more. So is it right that the kinds of situations that you were discussing at length about powers that you think the president would have are not presented here or are they presented here? We seem to have both an express initial proclamation that says, I'm putting into place a course of action, elements of which will be chosen in the future as circumstances permit or require. And second, the factual basis for the commerce report is the very basis on which the 9772 proclamation rests. Can you address that? Yes, Your Honor. I think that... I really appreciate the court's questions with respect to the outer bounds of the president's authority. In this case, it seems that what the president did here is exactly what Congress intended the president to do. He timely made a finding and concurrence. He timely identified a course of action, a strategy for addressing the threat of impairment to national security. And then in Proclamation 9772, in paragraphs one and two, he referenced the secretary's report, referenced his original proclamation and finding. And then he explained that he'd received additional information suggesting that the capacity utilization rate is still low. But just to be clear, did he or did he not adhere to, I think it was an 80% target figure that was in the secretary's report or did he or did he not? In paragraph four of Proclamation 9772, the president explained that the target capacity, basically the imports, I'm sorry, the production capacity, target capacity utilization level recommended in the report had not been met and was not being met. So he did reference the secretary's recommendations. Although, of course, he's not tied in the statute to the secretary's recommendation. Well, but the of course part is, I think, what we've been exploring at some length and how the outer limits do raise questions about a statute in which I think you agree with this. If the Commerce Secretary in his or her report says, I don't think there's a threat, then the president cannot act, right, under this provision. There is nothing for the president to do in that circumstance. Right. So Congress clearly put in place a precondition with various department heads playing a role in making reports to establish procedural prerequisites that clearly matter. And maybe they matter particularly in a context in which the substantive judicial review of an presidential determination has to be extremely limited because of the national security areas, as we said, making it particularly important that the procedural requirements be adhered to. And that does at least then raise the question of where the line is for when the president either departs from or doesn't depart from the basis in the secretary's report. But I think, as I understand your point, in this case, the president didn't depart from the secretary's basis. That is correct, Your Honor. Ms. Hogan, thank you for your endurance during this oral argument. I do have another question, though. Now, and that goes to 1862C3A. Judge Toronto had raised this provision earlier. This is in the circumstance where there is a negotiated agreement of some kind between the president and a foreign country. And under double little I, Roman numeral II, if that agreement has been entered into and is not carried out, or is ineffective in eliminating the threat to the national security posed by imports of such articles, then the president shall take other actions to adjust the imports of the article. And the question and concern I have here is that right here in this provision, Congress has expressly authorized the president to take further action when his initial action, in this particular instance, reaching an agreement with a foreign nation, has proven to be ineffective in eliminating the threat to national security. And so the inference, or one inference could be given that Congress included such an express authorization for the president to take further action in this particular circumstance, and that we see no such corresponding express authority from Congress to the president in the more general determination of the nature and duration of the action, in 1862 C-1. Why shouldn't we take away from that the idea that Congress did not contemplate the president to take subsequent actions under his C-1 authority, but instead, Congress only provided such subsequent action authority under C-3A, when an agreement has not proven to be effective? We think that the better inference is that, again, given the historical context of the machine tools case and the particular problem that Congress saw itself solving in 1988, which was its perception that the president was letting a national security threat linger and not timely entering into negotiations or addressing the threat, that it makes sense that Congress would provide specific instructions to the president in that circumstance. And to read subsection C-3A in the way that the trial court did, which is as the only way for the president under the statute to be able to modify action, actually leads to an absurd result in that it would mean that the president can take action five years after an agreement is entered into if those measures prove ineffective. A president is then authorized to, for example, impose a tariff, but the president would be precluded from doing what he did here, which is identifying a different remedy, a tariff, and then making an adjustment to that tariff five months after the original proclamation. And there's no reason why, nothing in the legislative history, nothing in the historical understanding of the statute that should lead the court to that conclusion. It's not required by the statute, and it is not the best reading in terms of the national... Ms. Hogan, then, is it your view that this particular provision in C-3A about, hey, if the agreement turns out to be ineffective, the president shall take further action, are you saying that that wasn't a necessary provision there, that if you had pulled that out of the statute, the president would have had that same authority anyway? Yes, we believe that the president has always had that authority, going back to 1955. No, but I'm talking about the circumstance that's presented in C-3A. Once the president reached an agreement with a country or multiple countries and then concludes that those agreements haven't had the effect, the intended effect, and so, therefore, the president can take additional further actions. What I'm asking is, if you pull that out of the statute, in your view, would the president nevertheless, under the statute, have that authority to take those kinds of subsequent further actions? Yes, Your Honor. I think that would be encompassed within the general understanding of what the action to adjust imports as a continuing authority, irrespective of what remedy the president selects. Go ahead. Go ahead and finish the answer. That C-3A is best read as sort of providing further guidance and directions to the president in that particular circumstance that Congress was particularly concerned about, and that includes further reporting to Congress. We think that is explained by the historical basis for the amendments. Okay. I'd like to go ahead and conclude this part of the audience, but I'll ask my colleagues if Counselor Hogan, thank you so much for indulging us. We had a lot of questions, and we appreciate your responses. I'm going to go ahead and preserve your four minutes of rebuttal time. Thank you, Your Honor. So, let's hear now from Counselor Nolan. Matt Nolan, may it please the Court. Matt Nolan, I'm appearing on behalf of the Plaintiff Appeals Trans-Pacific Steel, Orison Manusman, and Jordan International. We thank the Court for taking this case up expeditiously today, and look forward to your questions. I would like to pick up where the government left off on the discussion of the government's continuing position that they have continuing authority, or that somehow the president has the ability to take a single comprehensive action which lasts forever, as long as he feels is necessary to threat. The government relies strongly on pre-1988 law. That's not the law that exists today. The Congress put the May Amendments to Section 232 in place in 1988 for the specific purpose of putting strict timelines on presidential action. It seems to me there's the same words about time limits in 1988 can mean radically different things. One is we really want the president to act within some time period and not ignore the obligation. And another is we're setting a time limit that sets an outer limit on the time to act so that once that time disappears. What evidence is there that Congress had concern that was trying to do the second thing? Thank you, Your Honor. The 1980 amendments clearly were designed to compel immediate and effective action by the president, right? At the price of no power after that time limit? I would say the power is time limited unless the president goes back and gets a refresh or obtains a refreshment on the report. Let me just try to focus this. Put aside what is obviously the most important, or at least the first thing, which is what message you would get out of the current words of the statute. Really, put aside that for a minute. What evidence is there that Congress was trying to do the thing that you say it did, which is to close the window on presidential action after certain periods? Beyond the plain language of the statute, which would indicate that there is a specific limitation on the nature and duration of the action taken that's in the statute, you also have in the legislative history where the Congress actually considered giving the president more leeway to extend out the time period for which he would act, and they rejected that in the legislative history. They came back and said, look, Mr. President, we want you to get the report, make a decision within 90 days, and implement the action that you're going to take with respect to that report within 105 days. I don't have that material in front of me, but at least as you just described it, it seems to me it wholly fails to make the crucial distinction you're making. Where did Congress say, if you don't act by a certain time, we yank your power to act? I think that this goes back both with the 1988 amendments, but you can also go back before the 1988 amendments, because in past administrations, in administering Section 232, the government has, actually, the president has actually gone back and gotten supplemental reports from the Commerce Secretary in order to achieve the objective. And I take you back to President Ford's modification of Proclamation 3279 in 1979. Mr. Nolan, this is Judge Chen. I, too, am really interested in hearing a direct answer to Judge Toronto's question, and let me repeat it. It's where is there any expression of legislative intent that these time limits that were installed in 1988 into Section 232B were designed to yank away from the president any authority to take actions outside of that time limit? Is that the answer? There really isn't anything in the legislative history on that? I would have to agree with you, Otter. Yes, there is nothing in the legislative history that says that. However, I would also say that if it is interpreted that those amendments don't in any way constrain the administration, and consequently, what is the purpose of 1988 amendments in terms of putting guardrails on presidential action in the future? Where are we going to take the analysis? Because if we go there, are we then saying the president, once he has the authority and takes that initial action within the timeframe, he can take whatever action he wants in the future at what time, at what duration, or whatever nature that he feels is appropriate? Mr. Nolan, would you agree that the pre-1988 version, in fact, did confer that degree of authority to the president? It gave the president. It wasn't a time. The time limitation did not exist. Subsection C did not exist prior to 1988. Okay. So then let me just make sure I get a yes or no. So the pre-1988 version, you would agree it gave the president the authority to do subsequent actions years after the initial proclamation. Is that right? That is the way the statute reads, but I also would take the court to look at what actually has been going on with prospective application of 232 prior to 1988. As I said before, it has indicated in the Court of International Trade's opinion, the government actually has gone back and gotten supplemental reports from the Secretary of Commerce to support a change in decision. Did the government consistently do that? I guess I was remembering that it was undisputed that on numerous occasions, the president did not go back, even if on some occasions the president did. Right. Well, part of the issue is there is such a paucity of decisions with respect for us to rely on in this. If you actually look at the history of Section 232, of all of the investigations that took place, I think a total of some 31 or 32, including the Trump administration, and of course, into the pre-Trump cases, in 16 of the cases, Commerce found no threat existed. Nine of those were related to presidential action, and most of those were crude oil. So what we're really arguing about here is those crude oil cases, right? Those are the only ones where there was an action and then potential subsequent actions. In most of the cases, the president either didn't take action, which is one of the reasons why we got to the 1980 amendments in the first place. I thought I saw somewhere in the briefing here, or maybe in the more recent CIT decisions, that there was, I don't know, a couple of handfuls of modifications of the petroleum. Yes, there were actually, and one of those, yes, there were. And how many times did the president go back to the secretary for a new investigation? I know of at least the one time that the president went back. In 1975. In 1975. Okay, and that was, in particular, I think Ms. Hogan said that the particular action that was on review in Algonquin in the Supreme Court was one in which the president did not go back for an investigation. Right, that's true. You're right, Your Honor. I will also say there was one case where the president's change in action was challenged by the American Gasoline Refiners Association, and a district court found that the president couldn't take the action that he took. And can you just address anything you want to about the 1975 opinion of Attorney General Saxby, which, at least on its face, seems to have some confirmatory bearing on this case? Yes, the way I would look at that is obviously that opinion took place prior to the 1988 amendments. So it was looking at the old law. It wasn't interpreting the law as it exists today with us. But I also would take the court to take a look at the legal counsel's report that issued in 1982, where the government, in a report to the government... An OLC opinion? Yes, yes. It was the Attorney General's Office of Legal Counsel that issued a report on Proclamation 4341, which was done in 10 days. But it says that, you know, it is not an insurmountable burden to require that the president return to the secretary and obtain a new report prior to taking action under Section 232. This is an illegal opinion issued by the government to the president's office, where they, in 1982, actually indicated that they would anticipate a new report or a refreshed report going back to the president to support a new or different action being taken in connection with the petroleum actions being taken. And that then prompted President Ford to get a new report, which only took them 10 days to prepare. Wait a minute. 1982 can't be President Ford. I'm sorry. I'm sorry. It was 82. That was the decision. Yes, the President Ford's request for a new report was 75. I'm getting a little mixed up. So I'm sorry. When was this OLC opinion? What year? 1982. It's actually referenced in the Court of International Trade Opinion under footnote 9. Okay. So was it President Ford or was it President Reagan? It would have been President Reagan at that point. Okay. Can I ask you about your understanding of the restriction on the president's authority? As I understand it, you read the statute as giving the president 90 days to take action, and he must take action. But then after that 90 days, if the president wants to take any further action, he needs to get another secretary report. Is that right? Yes. He should go back to the secretary and get a refresher. Would that include terminating the tariff? Well, Your Honor, obviously, a president always has the ability to rescind a proclamation or an executive order. And of course, we're seeing a lot of that lately with President Biden. But I thought you just said to me that for the president to be able to take any further action of any kind outside the 90-day window, he has to go back to get the report from the commerce secretary who confers with the Department of Defense secretary and other important officials in order to investigate, come up with findings, and issue a new report and recommendation. Well, I guess what I should have said, a modification or a supplemental action taken, not a simple rejection or rescinding of a proclamation or executive order. What makes this for the distinction? I think a president within the statutory confines has always had the authority to remove or rescind a proclamation by a prior president. That exists. But I think there is a difference between that and giving the president basically unfettered authority to apply a statute for as long as he feels is in his interest, whether or not, you know, it continues to be in his interest. Yes, he has to do it on the specific statutory basis, which is admittedly quite broad, national security, which goes beyond, in fact, defense needs under the statutory definition. And it has to be specifically responsive to a threat that imports make to national security, not just using imports for some other national security purpose in the U.S. relations with a particular country. Your Honor is correct. Yes, there has to be a national security purpose behind it that is being advanced. I might, you know, ask... That's right. And just to add to that, it's not just imports in general. It's Turkish imports that have heightened national security, correct? That is correct. That is what the president espoused when he put the 50 percent tariffs on. I might add that the president removed those tariffs the following August of 2019 and dropped them back to 25 percent. And again, that would be outside his authority to do that. Yes, that would be outside his prescribed authority without having gone back, going back to obtain a refresh of the Commerce Department report to support the actions being taken. And I guess what I'm saying is the fault of the president's authority under Section 232 is derived from the Commerce, the secretary's report. It's in that report that a national security threat is identified and recommendations are made to the president. Once that happens, the president does have authority to either follow those recommendations, change them, alter them to fit what he thinks is the proper approach to go forward. But once he commits to that action, then there has to be some circumscription on his ability to forevermore change or adapt those actions as long as he feels or as long as it exists. Oh, go ahead. Why wouldn't that constraint in this particular instance be the secretary's report which said, we need an 80 percent domestic steel industry utilization rate? Yes, but we... And then now in this particular instance, the president discovers, okay, I agree. That's what we need. And this is the tariff I'm going to apply. And then half a year, a year later, he learns, wait a second, we only got a very modest step increase in the utilization rate of the domestic steel plants. And so therefore, we haven't met the agreed upon objectives articulated in the secretary's report. So we just have to go higher with at least some tariffs on some of these imports of steel. What is wrong with that outcome? Because in that sense, it is tethered to the secretary's report. It is tethered to the secretary's report, but I guess how far afield are we going to go from what the report actually says? Because the report indicates that the national security threat were steel imports writ large, right from around the world coming into the United States and creating a threat to US domestic production. The recommended measures were put in place were either a global quota, a global tariff, or a tariff of much higher proportions on some 12 or 13 countries. The president chose a slightly higher tariff on the global stage, but also agreed at the same time that he was going to undertake the clause in the statute, which allows him to negotiate an agreement with certain countries, which he did with Mexico and Canada and South Korea and Brazil. When were the Canadian and Mexican agreements? Those were going, I think those were in May in the summer, if I'm correct, after the original March. So by the time August of 2018 comes around, if what you just said is right, we have agreements with four of the five exporters of steel to the United States that are above Turkey in the list. The only one there's no agreement with is Russia. So the choice of the next biggest importer would be Russia or Turkey. That would be correct if we were to go back and look at the extrinsic evidence available. Well, that list is in the report. And I thought you just indicated that there were, well, I guess we do have at least two proclamations indicating agreements with South Korea and Brazil in April and May of 2018. I'm not sure, at least the joint appendix has anything about Canada and Mexico except that they were omitted from the initial one because negotiations look promising. But was an agreement reached with those two countries before August of 2018? There was a voluntary agreement put in place. I don't think the president ever had to come to a final decision because there was a voluntary, I think we're going to call it a voluntary street agreement. The Mexicans agreed not to go above a certain threshold. And do we know anything about Russia, which would then be the only country with a larger volume of steel imports into the United States, higher than Turkey at that period? Other than the fact that they had 25% duties imposed and that was about it. Okay. Mr. Nolan, I understand there were a lot of actions taken by the president vis-a-vis different countries that were spurred by this secretary report here on steel. In your view, which of those actions were outside the president's authority? I believe that the actions that he took with respect to coming to agreements were within the statutory framework under subsection, whatever, the 180-day period that he had. Okay. Even though he may have initially applied the 25% additional tariff? Correct. Okay. And that's because those negotiations occurred inside the 180-day period? Correct. Yes. So the only actions that he took coming out of this secretary's report that were outside of his statutory authority, in your view, was this proclamation 9772 and then subsequent action? I don't believe so, but I couldn't swear to it because obviously we are focused on this case, this particular case with Turkey. I'm not challenging other actions that he's taken. We're only challenging with respect to Turkey. No, I understand. I'm just trying to, at the same- I don't think there was. I don't recall. Yeah. I don't recall there was another action outside, but I would have to go back and take a long, hard look at the history of the record on that one. Counselor, is this case materially distinguishable from Allegheny-Pittsburgh Coal? I would say it's distinguishable, obviously, because the law was different. The statute was different. I'm not sure what else to say about it. Okay. All right. Fair enough. Any other questions? Okay. Hearing no other questions, let's go back to Counselor Hogan. You have four minutes of rebuttal time. Thank you, Your Honor. Counselor, before you start, and I won't dock you on this, but can you also tell us what the status of the stay is and the exemption? I'm sorry, the status of the stay in this case? Yes. Has there been any payment of duties yet? Yes, Your Honor. All of the judgments have been paid to the four importers. Okay. The reading of the status- Can you say something about the 1982 OLC opinion, which I'm afraid I have not looked at? I will confess that I'm struggling to remember which particular- Okay. That's fine. I don't want to waste your time, each of us, guessing, so that's fine. I guess what I would say is that the notion that it might be a good policy reason for the President to request a new investigation from the Secretary or to request for it is not the same as whether the statute requires it or whether the President is cut off from the power to take any kind of action, whether that's adjustment of the rate of tariff, whether that's a reduction of the tariff, whether that's termination of the measure. Under the reading that the trial court's reading and the importer's reading of the statute, the President wouldn't even be able to implement the tariff exclusion program that the Department of Commerce administers because those actions necessarily take place outside of the 90 and 15-day time periods. And that just can't be the case that the President is totally precluded from taking any kind of action after the 90 plus 15-day window. We would say here that the timeframe... Wouldn't Congress have an interest in ensuring that the delegation of its authority to manage the tariff to the President under these circumstances has some limitation to it? And isn't that interest reflected in the 88 Amendment? The other side of this coin that I'm describing is Congress simply giving away its authority to the President and authority that's been delegated to Congress under the Constitution. So what's your response to there being a delegation issue here if we accept your argument? The Supreme Court has already said that there's no non-delegation problem with this statute. And nothing in the 1988 Amendments altered that. I mean, if anything, Congress provided more guardrails by providing these timeframes for concurrence and implementation. And those guardrails served their purpose here because the President did act timely to concur and implement action within the timeframe set for the statute, set for action. So what are the guardrails you're talking about right now? So Congress wanted the President to act timely, to not sit on a report that there was a threat of impairment to national security. So if the President does not act timely,  does that mean that Congress is not going to protect national security? Probably not for the reason that we described in our brief, which is a slightly different principle, but simply that there's not any evidence that Congress intended for the President to lose his authority if he's a day late or two weeks late. Congress intended that the mandatory job be done, and that job is to protect national security. So much in the same way as the Supreme Court has read that the term shall need something more than the term shall in order to cut off power to act. We believe that that principle applies here. How do we know that the President is acting on behalf of the national security? We take what the President says, and in this circumstance... At face value, the President just simply says, I believe, wakes up some morning and says, you know, I believe today I'll impose more tariffs on Turkey. You know, I kind of don't like them, and I'm going to impose more tariffs. Would that be within his authority? No, it wouldn't. He would have to go back. He would have to base that decision on trade data, either his or the Secretary's. And here, hasn't Congress said, you must base this on the Department of Commerce data? Congress has not said that. Congress has said that there must be an investigation. Congress has not prohibited the President from meeting with his advisors, obtaining new information that can inform the President's adjustment of the remedy that he selects. The remedy that he selects is entirely within his discretion. But it's got to be related to tariffs, correct? Well, it has to be related to actions to adjust imports, whether that's tariffs, quotas, embargoes, some other action. It would not necessarily be limited to tariffs, although that is the tool that, one of the primary tools that you selected in this case. Just to, I think the Court had a question to my colleague about the Allegheny-Pittsburgh case, and I understand we never addressed the Equal Protection claim, so perhaps I'll just briefly address that particular case, which is an entirely different proposition, because our trade, our entire trade regime, we do not have a principle of equal taxation under our trade regime, unlike the West Virginia state constitution, which embodied a principle of equal taxation. Our entire import scheme is based on the principle that products from different countries can be and are routinely treated differently. So we think that's a critical distinction and a critical error that the Court of International Trade reached in the Equal Protection portion of its judgment. Okay. Go ahead. I was going to say, I think I would just respectfully request that the Court reverse the judgments for those two reasons and vacate the judgment. Okay. Thank you so much. We thank the parties for their arguments this morning. This Court will now take this matter under advisement and stand in recess. This Honorable Court is adjoined today.